At this time we'll hear Lehman Brothers 1EELLC versus Giddens. Good morning. Good morning, Your Honors. Douglas Baumstein from White and Case on behalf of 1EELLC as It is undisputed that pursuant to employment agreements between Hoffman and LBI, and as a result of his termination without cause, as of September 19, 2008, Hoffman was owed $83,052,000 payable in the first quarter of 2009 on account of the more than $765 million in net profit he earned for LBI in 2007 and 2008. It is also undisputed that LBI has never paid Hoffman the compensation it owed him under his LBI contract and upon which he bases his claim below. The trustee argues that certain compensation from Hoffman's next job with Barclays, some paid as much as five years after LBI was obligated to pay Hoffman, benefited LBI by satisfying the obligation to pay Hoffman $83 million in the first quarter of 2009. The unambiguous Barclays agreement says no such thing, and the trustee's argument violates fundamental principles of contract interpretation, including that an intent to benefit a third party must be shown on the face of the assignment of the agreement, courts will interpret unambiguous agreements on their face, courts will not take a blue pencil to certain contract terms and interpret them as separate from the rest of the contract, and fundamentally, the argument interferes with Hoffman's right to negotiate a contract that does not include secret terms that he does not agree to. Although the trustee will —  And you're saying that what sealed the deal here was Barclays agreeing that they would not have him suffer that loss and that they would pay him the $83 million? MR. RIEFFEL. Your Honor, no. See, and you use the definite article, the $83 million. Hoffman asked specifically for the legal obligation that they assume his contract. It's undisputed he asked multiple times, and it's undisputed Barclays said no. He then went to a different tactic and said, well, you know what, you still have to pay me this money somehow. And he — by the way, he raised that same issue with competing employers, including Millennium, who agreed to pay it to him. JUSTICE KENNEDY. But that money was the loss that he was saying he would suffer by not getting the bonus. MR. RIEFFEL. Your Honor, yes, that is what he's — that was his negotiating tactic. He was allowed to ask for some certain to get hired, and it wasn't paid on the terms that were consistent with LBI's obligation, and the Barclays agreement doesn't say that it is. Sophisticated parties know how to put into — JUSTICE KENNEDY. I mean, he had recorded conversations here that basically said, look, I'm losing this $83 million. I don't want to work for you unless I know I'm going to get that. And they finally capitulated and said, okay, we will give you a compensation that will make up for that. Isn't that — I mean, that's the accurate record, isn't it? MR. RIEFFEL. Your Honor, actually, it's not, because what they say is, we'll give you money. They don't say we're going to pay the legal obligation, and, in fact, when — JUSTICE KENNEDY. No, they say they'll give you the money that you're asking for, and what he was asking for was to be made whole for the $83 million. MR. RIEFFEL. No, no, because to be made whole — remember, he was — look at this in the context where he was. He was negotiating with Millennium, prepared to pay 20 percent of his profitability, as opposed to 14 percent and certain guaranteed payments. He would have made more money from Millennium had he gone there, but what he gave up was he gave up a little bit of the high end to get a little bit of guaranteed payments. Millennium was prepared to pay him that. That's what the market rate he was — his compensation percentage was under what he would have gone for Barclays, and he said, I wanted this money. He also asked for the legal obligation, and they said no, and — JUSTICE O'CONNOR. But didn't the bankruptcy court, in essence, make a factual finding based on the tape recordings and other evidence that your client sought the $83 million to be made whole from his lost bonuses and that Barclays gave it to him? MR.  Well, the bankruptcy court said — JUSTICE O'CONNOR. Not the full $83 million, but the — MR.  Right. Now — JUSTICE O'CONNOR. — 2008 compensation. MR. CLEMENT. This is not ultimately — this is the — he was paid under an unambiguous contract. It was improper to look at the parole evidence, which is plainly going to, you know, the intent behind this. Sophisticated parties know how to say what it was, and, in fact, you know, the trustee is going to argue that this was really one obligation all along and one contract. Nothing in the Barclays agreement purports to be an assumption, delegation, or satisfaction of LBI's obligations to Hoffman. And as Judge Kodal found in Corrath, which was affirmed by this Court, including Your Honor Judge Livingston, and which addressed Barclays' obligation to former LBI employees who had written contracts with LBI and Barclays, quote, there is no ambiguity as to whether the LBI employment contract and the Barclays offer were intended to be read as a single contract. It is plain that the two documents were intended to be read separately. The employee's LBI employment agreement was directed towards employment with LBI, while the Barclays employment offer addressed a separate transaction, namely employment with Barclays in September 2008 after Lehman's bankruptcy and Barclays' purchase of LBI's business. Thus, contrary to the district court's findings, there's not a single obligation and a single contract. There are two separate set of contracts creating two obligations with two unrelated parties for two distinct time periods. But you have a contract that delegates, under certain circumstances, a duty to pay the bonus money, not the $7.7 million, but most of the $83 million. And then you have a situation in which Mr. Hoffman is certainly aware of that delegated undertaking and, and, and sought to, to enforce it. Okay. So, am I correct? Well, you're incorrect about one thing. He was not actually aware. There's no notice of the delegation. And in fact, you're talking about the APA, obviously. Section 2.4 of the APA makes very clear how Barclays was supposed to take on assumptions of, of employment agreements. They had a right to do it under 2.48. They did not do that. They didn't assume the employment agreement, but under 9.1c, they did assume LBI's liability for the 2008 bonus compensation for transferred employees. So the argument is your client became a transferred employee when he accepted employment and he was, he received his 2008 bonus. Okay. So, again, there's a few problems with that issue as well, including, first of all, Korth is very clear that there was no obligation owed to people like Hoffman who had written employment agreements. This is, it's a small minority of people at Lehman. But also, if you look at that agreement, at the offer, he rejects the offer. It required two things to, to accept the APA offer. He had to send an email and work on September 22nd, 2008. It's undisputed, it's undisputed that he did neither. Instead, he negotiated bespoke terms of employment. And those bespoke terms of employment, um, by asking for that, that is a rejection and a counteroffer under clear law. And with respect to, if you are under the APA, you have to look, unlike what, um, Judge Chapman did, you have to look at all the terms. And that includes the most important one that, that's missed out here, that the payments were required to be made on or before March 15th, 2009. There was no assumption of the employment contract. I mean, if there had been, there would have been all kinds of bankruptcy, uh, complications from that because Lima would have had to, uh, affirm the contract and then assign it to somebody else. So they were proceeding in a completely different way, which may provide a wedge argument for you, but it's not an assumption of the, of the, uh, of the employment contract. It, it, it, you're right. There was no assumption and they were permitted under, under both the code and their agreement with Barclays, between Barclays and Lima to assume the contract. But what they, what they also did though, is in, even if you assume there's a delegation in the APA, you know, what does the delegation mean? It's very clear because let's look at what, how Lehman described it, where they say that $53 million in special awards and the elevated performance bonus paid after March 15th, 2009, quote, we're in the nature of performance-based retention bill payments. We're not in the nature of a bonus for his 2008 performance at Lehman. And were made after the March 15, 2009 cutoff date for requisite payments under the APA. It's only through the happenstance that Lehman's bankruptcy took years to administer that the trustee can argue that the, that payments that did not vest until 2015 satisfied obligations to pay compensation that were fully accrued and payable in 2009. Doesn't the parole evidence, as you argue, indicate that that's clearly what it was? No, it does not. No, it does not, Your Honor. That was the negotiation. That was what was holding up the negotiation. That's what your client was holding out for. And then when he got it, he accepted the offer. Your Honor, actually, that's, that's not even correct about what the parole evidence says. The thing that they point to the most, the trustee, is a statement where Eric Bauman says, you earned that money, it's yours. But the very next words, and you can listen to the tapes, you have them. At a Bauman South, at a Bauman South mouth where, but we're trying on the other side because not everything was accrued in the bonus pool, okay? It's not your fault, that's the way it was. That was not an acknowledgement that Barclays was paying LBI's obligation. It was an excuse why it was not. If Barclays was paying Hoffman his LBI compensation, as LBI's delegate, he would have said, hey, it got wiped out, but we're paying you it. He never says that. You never hear a clear statement about what that term, what these funds are supposed to be, other than Hoffman saying, I get it. What these are, are in fact, retention, these are retention payments. You don't want to take on the agreement and have to pay me a really big check. I wanted it assumed you said no, we talked about it. And that's what the parole evidence is, even though you shouldn't even be looking at it. The fact is, if Barclays was taking on the obligation, it was really easy to craft those words in this agreement and just say, upon payment of these terms, it shall satisfy LBI's obligation. The following compensation, by the way, none of which mentions the words $83 million. The following compensation, upon being paid, satisfies the obligation. Hoffman hereby waives any right to payment. Really easy. These are sophisticated parties. And when sophisticated parties negotiate a contract, they know how to put the words in to say what they mean. They don't rely on ambiguous discussions where Hoffman says, I want to be paid a certain amount of money. I wanted the legal obligation, you said no. And they said, well, we can't quite do it like that. It doesn't work on the accounting within Barclays. We're going, what we want to do is we'll pay it different, but we want you in that chair for the next five years. Because he was a valuable employee. Isn't that, what's critical to that is for you, your arguments that he wasn't a transferred employee? No, it doesn't matter, it could be either, right? He's not a transferred employee, but even if he were a transferred employee- Well, his employment, even his agreement, there was no gap in his employment. He was a Lehman Brothers employee on September 21st. He was a Barclays employee by the agreement as of September 22nd. Yeah, but that agreement is clearly, and the record's unambiguous on this, that's just a, it's a mistake in the agreement. He was an employee as of October 3rd. Mistaken, did you say? It's a mistake, the date. He actually started employment on October 3rd. There is literally no dispute about that. He was interviewing very clearly, and in fact, the negotiations before he was hired, most of the, one of the recordings is October 2nd, like there's no doubt that that date is- You're saying he was not paid, and was not an employee, technically, and he didn't get the salary from September 22nd? Correct, correct, he was not an employee, he had no employment agreement with Barclays, he wasn't showing up to work. And more importantly, he wasn't showing up to work. Well, it says he didn't show up to work on the 22nd. No, he did not, it's also clear in the record, he did not show up to work until after October 3rd when the agreement was reached. And when he did, was he paid for the time that he had been unemployed? No, the answer is no, because there's no record of that. He was only paid for his employment going forward, which was as of October 3rd. I know, but the agreement, you say we should look at the agreement. The agreement clearly says that he is an employee as of September 22nd. But I don't think whether there's a gap or not is irrelevant to what the terms of the agreement say. And the terms do not say, do not even mention Lehman, right? It was really easy to put those words in there, that was the party's intention. Jonathan Hoffman, put that contract in front of you, your honor. You're thinking about maybe going to Millennium, you're thinking about going to Barclays. Put that contract in front of you. What words would you look at there and say, this agreement says, you know what? I'm going to be giving up my claim against Lehman. I understand I may not collect on it. I understand Lehman may have a penny on a dollar. But I'm giving up my claim by accepting this agreement. He had a right to negotiate his own terms of employment, which is exactly what he did. And those own terms do not say that anything that he's doing satisfies Lehman's obligation to him. But he's not seeking compensation pursuant to that agreement. He's seeking compensation now from the trustee. Right, for the $765 million he earned under his 2007 and 2008 agreements, and which the trustee never paid. You've reserved three minutes, we're about to- I have, your honor. We'll hear you then, sir. Good morning, your honors. May it please the court. Jim Fitzpatrick for the LBI trustee. Your honors, the key point here is that there was, of course, a three day trial before the bankruptcy court, at which Judge Chapman heard live testimony from the critical witnesses, as well as contemporaneous audio recordings that Mr. Hoffman secretly made of his negotiations that led to his Barclays agreement. Upon considering all of that evidence, the bankruptcy court made factual findings, including, and this is paragraph 51 of Judge Chapman's opinion, 2611 of the appendix, quote, the evidentiary record is clear that Barclays ultimately agreed to pay Mr. Hoffman the $83 million he was owed by LBI, and that finding, in fact, like all of Judge Chapman's findings, in fact, was adopted in its entirety by the district court. It's not clear to me from the appellant's brief whether they're actually making the argument that that factual finding was clearly erroneous or not. But if they are making that argument, it's clearly incorrect. Let me ask you this hypothetically. Yes, your honor. Suppose the deal that Mr. Hoffman worked out was he would get paid $10 million up front by Barclays. And then he would get 15, 18% of the business he brought in going forward. Would that $10 million, as a matter of fact in law, be deemed to abate to the tune of $10 million, Lehman Brothers Obligations? That would depend on what factual finding the bankruptcy court made, and if the bankruptcy court made- If all the facts were the same. Yes. Except it was a $10 million payment. Yes. Yes. I think your position has to be. But then Mr. Hoffman can't negotiate the terms of his next employment. He's free. You know, he's free. And he's a very valuable figure. I mean, I don't know how anybody makes that much money, but it seems to be legal and more power to him. And that's very valuable. And Barclays is interested in acquiring him. And basically he can't take $10 million from them as a signing bonus without losing $10 million of his claim against Lehman Brothers. That's what you're saying. No, your honor. I'm saying that it depends on the factual- If the bankruptcy court made the factual finding that Mr. Hoffman approached Barclays and said, I'm out- Yeah, but it has to be based on something. And it sounds like it's, I mean, maybe it's sufficient, but it sounds like it's based on the fact that $83 million equals $83 million. That's a part of it, your honor. But there are days of contemporaneous audio recordings in which it's clear that what the negotiators are negotiating is Mr. Hoffman is going to Barclays saying, I'm out $83 million. That was no secret to them. He testified to that. He then says, he makes repeated references to legacy issues, legacy compensation issues. And it's clear what that means, $83 million. Barclays then finally comes back to him and structures a deal that is designed to, to the best they can, replicate his LBI bonus. And which, to the tune of $83 million, and Mr. Hoffman comes back and says, okay, that's, I've got the $70 million in special awards. I want more time to make up the money I'm out. The money he is out is the $13 million difference between $70 million and $83 million. So yes, I mean, the fact that it's 83 million in both places is certainly relevant, but that's not the only factor. We also have the issue of the multiple contemporaneous audio recordings. And to your honor's first point, Mr. Hoffman was free to negotiate whatever he wanted. The issue here is that what he chose to negotiate. You just said a moment ago, whatever it is he negotiated, unless it was more than $83 million, would be deemed to abate Lehman Brothers' obligations to pay him his salary, up to that extent. Your honor, only if he was negotiating for Barclays to pay his LBI bonus, which is what he was doing. He could have gone to Barclays and said, you know what, I'm out 83 million, I want you to pay 40 of it. But the APA didn't cover $83 million. If the APA was operating here, he would have been out 7.7 million of what he was paid. Because the 7.7 million, was that paid pursuant to the delegation? No, your honor, both courts- How does that get, I mean, I'm going back to Judge Chapman's view. I mean, how does that get to reduce his Lehman Brothers obligation to him? Because, your honor, of the legal principle that you don't get paid twice. Now, it is true that 76 million of the 83 is off the table, because that's the law of delegation. LBI delegated to Barclays to pay 76 million. Barclays accepted that delegation and paid him. And the performance of that, not the delegation itself, but the performance of that discharges the 76 million. Then we've got the question of the 7.7 million, or whatever the exact number is. And there, the district court correctly found that it doesn't matter whether it's within the scope of the obligation. The fact is, Mr. Hoffman negotiated for another party to pay his LBI bonus, and he can't get paid again. But surely, when Barclays paid that, they paid that as a signing bonus. I mean, they didn't just give away, Barclays not giving away, are they still giving away millions? Not to my knowledge, your honor. The record, I mean, but that's not what the evidence was, your honor. The evidence, as Barclays' executives testified, was we stepped into LBI's shoes. They testified they were surprised to hear about this claim, because LBI owed him $83 million and we paid it to him. So I, of course, don't disagree with your honor that there was a component of this, that of course, Barclays wanted Mr. Hoffman to come work for them. They didn't just hand him a check for $83 million and say, it was lovely knowing you. I mean, part of this was that he would come work for them. But what the bankruptcy court found, the facts were, was that- And so, without that, I, echoing my colleague, I'm having difficulty seeing what to do with the $7 point something million. I don't see what, how the factual findings would support including that as part of the arrangement. Yes, your honor. So the factual finding, and even the bankruptcy court made this factual finding, was that it was meant to satisfy the $83 million bonus. It's just that it was outside the scope of the delegation. And the district court agreed with the fact finding. Yes, it was outside the scope of the delegation, but yes, it was part of the $83 million bonus. And equity doesn't permit him to be paid that, again, regardless of whether it was part of the delegation. I mean, what the district court found, and this is correct, is that even absent a delegation, if Mr. Hoffman, as the bankruptcy court found, went to Barclays and said, I'm out $83 million, I'm not coming to work for you unless you pay me that $83 million. And Barclays agreed to do that, then the claim is extinguished. Now- And other than Corbin's on contracts, what cases should I look for for that proposition? Right, so the case that the district court cited was Mathias versus Jacobs. And there, that just stood for the general proposition, and the court used an unjust enrichment framework for that one, is that you shouldn't be unjustly enriched. And in this case, if Mr. Hoffman were to get the $83 million, which record's undisputed, he did. Plus, the $100 million that he made trading for Barclays, over and above the 83 million, which was under the same terms as existed under his Lehman deal. If he were to then get a claim against the Lehman estate at the expense of the other creditors for whatever the estate is paying out on that $83 million, that would be unjust enrichment. I'm not sure I see how it's unjust enrichment. If Barclays thinks it's worth $83 million to get on board a person who can generate hundreds and hundreds of millions of dollars worth of transactions. It's not vis-a-vis Barclays, it would be unjust enrichment to him because he'd be being paid his LBI bonus more than once. And we have to remember, we have that factual finding. Unless that's clearly erroneous, the bankruptcy court has found that Barclays paid him his $83 million LBI bonus. If he gets $1 over and above that, he's getting paid again. At least under the factual findings of the bankruptcy court. And I think, if you're honest, again, if you haven't already, I share my adversary's invitation to listen to the audio tapes. There's no question what was being negotiated there. It's the payment of the $83 million that he was out from LBI. Well, if he had timely accepted the offer as of September 22nd, what would he have been paid from your point of view? What would that have included? Would that have included the $83 million? It would have been up to Barclays at that point. It is true under Koreff that he could not have sued Barclays for the $83 million. But if Barclays had chosen, if he had accepted the offer and Barclays had said, we've looked at what your bonus should be and your 2008 bonus in total is going to be $83 million. That would satisfy his LBI bonus, because it was for his performance in 2008 and a stub of 2007. Is your position that if he had accepted timely, they were under no obligation to give him that $83 million? Koreff holds that he couldn't have sued them for it, that's true. It is our position, in fact, that if, let's say Barclays had only paid him the $10 million. He would have had a claim against the Lehman Estate for $73 million. I can't, I don't dispute that. If he had come against the Lehman Estate for the $73 million, it would have, at that time, been our position that LBI could go after Barclays under the asset purchase agreement. That's off the table now because of a settlement. But that would have been our position at the time. But there's no question he couldn't have sued Barclays. The APA was between the Lehman entities and Barclays. Hypothetically, suppose he went to work for Big Bank. And Big Bank, and he said, I want a signing bonus. And they said, how much? He said, $83 million. And they negotiated, and they paid him $83 million over five years. Would that have abated LBI's obligation? It would have required a factual finding by the bankruptcy court that that $83 million was intended to satisfy his LBI bonus. Now, if there were no audio tapes, and this never came up, and it was just an $83 million. I'm sure the bankruptcy court wouldn't have found that, of course. Because you don't have the additional elements of the APA, of Barclays acquiring all of LBI's assets, of him specifically going to Barclays and saying, I want this $83 million because I'm out it from Lehman, and you have legacy issues. He couldn't have done that with another entity. So I don't dispute the factual finding probably would have been different in that instance. But here, we know what actually did happen, which is that he went to Barclays, which had acquired LBI's assets. He pointed out to them that they had legacy compensation issues with him. He wanted his LBI bonus, and they structured a payment over and above. They replicated his LBI contract, don't forget. $200,000 base, 12% of profits, up to $25 million, 14% above that. And then on top of that, added $83 million. And as the bankruptcy court found, based on the record, the reason for that was to satisfy his LBI bonus. And again, he can't be paid that again. And I would just, to close on that point. It certainly sounds, though, that after the ship he was sailing on went down, as far as you're concerned, there was nowhere he could go and get a signing bonus that would not inure to the benefit of Lehman Brothers. Not at all, not at all, your honor. He was a free and valuable player. I'm certainly a free and valuable player. He could go anywhere he wanted and negotiate at anything he wanted. I don't dispute that. If what he chose to do, which as the record reflects and the bankruptcy court found, if what he chose to do was go negotiate for his LBI bonus, and he was successful in doing that. And particularly here, where he was doing that by using the potential for legacy issues from Barclays. And there was a delegation where Barclays had an obligation to pay 2008 bonuses. And taking all of those facts into account, if the finding was that he was paid his LBI bonus, then he can't get it again. If he went to a different bank, if he went to Millennium, and nobody mentioned LBI. There was nothing, he never even, they didn't know he was out 83 million, he never mentioned it, it didn't come up. He said to him- As a matter of negotiating, you may want to back up your demand for $83 million by saying that's what I want because that's what I lost. Well, and then if the finding is that that's what Millennium paid him because they meant to satisfy $40 million of his $83 million bonus, then yes, he can't get paid that again. But you don't think that's dependent on whether he really is found to be a transferred employee? It's not required that he be found to be a transferred employee. I mean, the finding is correct under the contract that if you accept Barclays' offer, and it doesn't have to be any particular offer. It just has to be Barclays' offer, as the bankruptcy court found, and that's backed up by 9.1A of the APA. He is a transferred employee, but no, it's not required that he be a transferred employee. What's required is the factual finding that he was paid his LBI bonus by the bankruptcy court. Thank you, Your Honor. Thank you. Thank you, Your Honor. So, there's a few things I want to address very quickly. If there was a delegation, like he claims, in which they agreed to pay this, Barclays didn't have to recreate or replicate anything. They just had to say, there's a delegation, we owe you the money, we're going to pay it to you. They didn't do it. Instead, he negotiated bespoke terms of his next employment. And as you pointed out, that's exactly what he asked Millennium, who, by the way, they knew he was at $83 million because Mike Gelband, who was not going to Barclays, and that's who he talked about as there may be legacy issues. He said, they may think they're legacy issues. He's like, but Barclays will deny them, which they did. So, he was negotiating as a free agent. It was his term. He knew that right away. The difficulty, I'm just going to sort of put it to you, but the difficulty you've got with your case is you have a fact finding entered after a trial with live witnesses by Judge Chapman. What do you do about it? Okay, Your Honor, so there's a couple of things. One is, I think the facts are clearly erroneous. I don't think you have a clear enough statement about this money is actually satisfying your obligation because, he said, I want you to satisfy my, his first request was assume my contract. What does that mean? Take the legal obligation. He says, okay, well, if you're not going to do that, just pay me a sum certain, and they negotiate new terms. And this is important as it relates to the delegation issue in particular. I know you focused on the $7.75 million for 2007. The delegation, if he had not signed any agreement and they paid him exactly as they did, the only thing that they could possibly look to would be what the amount he got March 15, 2009, the $30 million. And by the way, this is exactly what Lehman said this contract means. When they went in front of the court in a litigation with Barclays and said, the amounts in 2010 and 11 were performance-based retention bonuses, not in the nature of his bonus for 2008. So they're very clear that if you're taking a delegation, you can't differ materially from the performance. And what differs materially here is it requires the five years of employment rather than four months of employment. And there's one final thing I want to leave you with, because it's easy to lose- I mean, Barclays would have to be crazy to pay somebody $83 million to come on board for five months. Well, Hoffman thought they would. I mean, he said, I thought you'd assume it and we'd work on trust the way I've worked in the past with Lehman. But they didn't, and so he negotiated separate terms. But it's easy to lose sight, Your Honor, of kind of key facts here, because Hoffman was an individual and he's making a lot of money. And one way to refocus this is, pretend Hoffman's a third party. Let's just call him AT&T. Suppose LBI had an agreement with AT&T that obligated it to pay $83 million in March 2009. Pursuant to the APA, Barclays had a right to take assignment of the AT&T contract. The contract is not assumed and rejected, entitling AT&T to rejection damages. Then Barclays negotiates an agreement with AT&T for it to provide services over the next five years. And that agreement makes no mention of LBI's agreement with AT&T. There would be no one who would conceivably argue that payment under the new contract satisfied LBI's rejection damages obligations. But those aren't the only facts that the court used to make its determination. A critical fact was that the actual recorded conversations that the parties had, which the court found, clearly indicated that that's what this negotiation was going to cover. But you know what, when you go and decide what a party's intended, you don't look at what the discussions are. Well, that's your parole evidence argument. Right, but it's clear, Your Honor. Well, but it's not clear. You can't say, I understand your parole evidence argument, but you can't say if you reject the parole evidence argument, that somehow the party's intended something different than what's on the tape. Well, Your Honor, I can, though, and the reason for that is because you have the undisputed facts that he also says on the tape. Hey, what I said in the beginning was, I wanted you to assume it, we talked about that, and you said no. What they say afterwards is, okay, now let's go through a negotiation to talk about a some certain that will get me over here. But Barclay said, we'll do that, but we need you in that seat for five years, because you're a valuable employee. We don't want you in that seat for four months. So that- But they did make it clear in that conversation that they were responding to that particular concern and that demand. Right, and that's a demand for a payment. It's not a demand for a legal obligation, and money is fungible. Legal obligations are not. Yeah, but losses aren't fungible. He put it in terms of with the money he was losing. The money is fungible. He didn't say, I want a bonus that's on top of what I got. He said, I want you to make me whole. I don't want to lose my bonus. That was the nature of- Well, your honor, he was anchoring to a number, and it's the same number he requested, not only of Millennium, he also asked Bank of America. I'm not talking about the number. I'm talking about what he says that that payment was, what his concern was. And his concern was losing the bonus. Right, which by the way, he did lose the bonus. He wasn't paid that in March 2009. He knew, at this point, whether he could ever collect was always going to be in doubt. He thought that this was an empty shell. There's contemporaneous evidence. There's going to be nothing for this. So yes, he thinks he's losing it, and he's not losing the legal right to the claim. He's losing the ability to get $83 million in March 2009, which he had a rock solid accrued legal right as of the time he's negotiating with Barclays. Do you think he gave up that demand rather than that that demand was satisfied when they agreed? You know what, if they wanted to satisfy it, it's really easy to come up with those words in a contract. Incredibly easy, your honor. You don't have to spend a lot of time in law school, and Barclays has a lot of good lawyers, and Lehman has a lot of good lawyers. If that's what they intended, really easy to write. Upon payment of these special awards and this portion of your performance bonus for money you make based on profits for Barclays, your claim against Lehman will be deemed satisfied. If indeed the transaction is such as Judge Daniels is positing, it wouldn't be in the interest or even the interest of either party to put that in. Well, your honor- Because I mean, why is anybody bothering to help out Lehman Brothers? It's not a player anymore, it hardly even exists. Barclays and Lehman did end up having some litigation about this, but actually there is a- I'm not familiar with that and I- Okay, and that's actually fine, whether they had an obligation. But actually there is a reason, because it goes back to fundamental law about, hey, Lehman's saying they're a third party beneficiary, that the payment here extinguished our obligation. How do you establish third party beneficiary obligations under New York law? You have to be explicit. Nothing is explicit. It is anything but explicit. The fact that we have to go through what I'll call fairly ambiguous parole evidence, that doesn't say we're clearly paying you this to satisfy the legal obligation. And there's a lot of things that I think if you look at Eric Bauman's test that said, you know, it got wiped out, I'm sorry, we're doing the best we can. They either satisfy it or they don't. And they had- and what they did was they agreed to new terms of a new employment, and that's what the clear contract says. And Hoffman had a right to that. Thank you, your honor. Thank you both. We'll reserve decision.